IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID C. DILLOW,                              )
                                             )
                      Plaintiff,             )
                                             )
        v.                                   )      Civil Action No. 04-1230
                                             )
JO ANNE B. BARNHART,                         )
COMMISSIONER OF SOCIAL SECURITY,             )
                                             )
                      Defendant.             )

MEMORANDUM ORDER

CONTI, District Judge

### *Introduction*

This is an appeal from the final decision of the Commissioner of Social Security

("Commissioner" or "defendant") denying the claim of David C. Dillow ("plaintiff") for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42

U.S.C. §§ 423, *et seq.,* and Supplemental Social Security ("SSI") under Title XVI of the SSA, 42

U.S.C. §§ 1381, *et seq.*  Plaintiff contends that the decision of the administrative law judge (the

"ALJ") that he is not disabled, and therefore not entitled to benefits, should be reversed because

the decision is not supported by substantial evidence.  Defendant asserts that the decision of the

ALJ is supported by substantial evidence.  The parties filed cross-motions for summary judgment

pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  The court will affirm the ALJ's

decision.

### *Procedural History*

Plaintiff filed the application at issue in this appeal on May 9, 2002, asserting that he became disabled and therefore unable to work on June 30, 1995 due to bipolar disorder and chronic depression.  (Transcript ("R.") at 65-67, 79).  His application was denied at the initial level. (R. at 50-51), and he then filed a request for a hearing. (R. at 32).  On March 17, 2003, an Administrative Law Judge ("ALJ") held a hearing. (R. at 406).  Plaintiff appeared at the hearing and testified, as did his parents. (R. at 406-59).  Plaintiff was represented by an attorney at the hearing. (R at 408).  In a decision dated September 14, 2003, the ALJ determined that plaintiff was not disabled and therefore not entitled to benefits. (R. at 32-42).[1]  On November 5, 2003, plaintiff requested a review of that decision. (R. at 26).  On July 8, 2004, the Appeals Council denied the request for review. (R. at 5-7). Plaintiff subsequently commenced the present action seeking judicial review.

### *Legal Standard*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits.  42 U.S.C. § 405(g).  This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner.  42 U.S.C. § 405(g).  "Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate.'"  Ventura v. Shalala, 55 F. 3d 900, 901 (3d Cir. 1995)(quoting Richardson v. Perales, 402 U.S. 389 (1971)).  This deferential standard has been

---

[1] Plaintiff apparently then filed a subsequent application for SSI on November 7, 2003, which was granted on April 4, 2004.  Plaintiff was adjudged to have been disabled as of November 1, 2003. See Docket No. 7, p. 2 n. 1.

referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F. 3d 113, 118 (3d Cir. 2003). This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. Id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001)(reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry).

### *Plaintiff's Background and Medical Evidence*

Plaintiff is a 39-year old man who suffers from bipolar disorder, chronic depression, a personality disorder, anxiety and a past alcohol dependence. He currently takes Prozac, Risperdal, Lithium and Depakote for his emotional conditions and Trazadone to aid with sleep. (R. at 412-22). He is divorced and has two teenage children who live with his ex-wife. Plaintiff resides at his parents' home.

Although he exhibited poor academic performance throughout his school years and was diagnosed with borderline intellectual functioning and a full scale I.Q. of 74 (R. at 360),[2] he was not officially diagnosed with bipolar disorder and depression until 1995, when he was serving a prison sentence for robbery and criminal conspiracy. (R. at 415-16). He was first incarcerated between 1995 and 1998 and was then released on parole. (R. at 415). Once released he sought mental health treatment on a fairly consistent basis. He returned to prison in 2000 based upon a parole violation and an assault charge. (R. at 415). He was ultimately released in June of 2002. (R. at 415).

---

[2] When he was 16 years old, plaintiff was enrolled in the special education class for students functioning within the "educable mentally handicapped range of ability." (R. at 360).

During the period of time between incarcerations, plaintiff worked intermittently as a night shift janitor at a nursing home owned by his brother. (R. at 419).  His only other past work experience appears to have been as a gas station attendant and a day laborer. (R. at 433-35).  He has not worked since his release from prison in June 2002.

Plaintiff testified at the hearing that he has no friends, that he spends some time with his brother, that he has no hobbies other than mountain biking and fishing and that he passes most days sitting on the porch or watching television. (R. at 427-29).  Plaintiff does not currently drive and does not hold a drivers' license. (R. at 440).  Both plaintiff and his parents testified that plaintiff angers easily, often over trivial matters.  He is prone to frequent and loud outbursts and has a history of getting into physical altercations. (R. at 420-21, 426-27, 433, 436, 438-39, 446-47).

Plaintiff's medical documentation of his impairments is somewhat limited most likely due to his two periods of incarceration.  He was diagnosed in October 1998 with major depression and an antisocial personality. (R. at 225).  He presented again on November 17, 1998 and was prescribed Paxil. (R. at 223).  By December 22, 1998, plaintiff was noted to have a more spontaneous affect. (R. at 222).  He appears to have continued counseling sessions, approximately once a month, through October 1999, when he returned to prison. (R. at 213-21).  The treatment notes consistently discuss plaintiff's difficulty controlling his anger and problems with being in crowds. (R. at 213-21).

Plaintiff returned to the Centerville Clinic upon his release from prison in June 2002.  The Adult Assessment Form describes plaintiff as depressed and bipolar with a history of a suicide attempt. (R. at 251-52).  Plaintiff was noted to be on psychotropic drugs to aid in

4

controlling bipolar symptoms and to aid with sleep. (R. at 257).  Plaintiff was thought to have

good cognitive functioning and to be of average intelligence. (R. at 257).  He apparently began

attending individual outpatient treatment sessions every other week. (R. at 259).  Dr. Pillai rated

plaintiff's GAF score at 55.[3]

Plaintiff then applied for welfare benefits, alleging an inability to work because of his

bipolar disorder and the side effects of medication. (R. at 241).  Dr. Terry Roh filled out an

assessment form declaring plaintiff to be temporarily disabled for the period beginning May 12,

2002 and ending May 12, 2003. (R. at 242).  Dr. Roh offered the diagnosis of "bipolar" in

support of his conclusion.

On September 13, 2002, Thomas E. Andrews, a DDS psychologist ("Andrews"),

conducted a clinical interview of plaintiff and reviewed plaintiff's treatments notes from the

Centerville Clinic.  Andrews diagnosed plaintiff with suffering from bipolar disorder and a

personality disorder, "with explosive episodes and antisocial traits." (R. at 263).  Andrews

concluded that plaintiff had low average educational skills. (R. at 262).  He assessed plaintiff has

---

[3]The Global Assessment of Functioning Scale ("GAF") assesses an individual's
psychological, social and occupational functioning with a score of 1 being the lowest and a score
of 100 being the highest.   A GAF score of between 50-60 denotes moderate impairment.   The
GAF score considers "psychological, social, and occupational functioning on a hypothetical
continuum of mental health-illness."  American Psychiatric Association: Diagnostic and
Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000); see Lozada v. Barnhart,
331 F.Supp.2d 325, 330 n.2 (E.D. Pa. 2004).  An individual with a GAF score of 60 may have
"[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;"
of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social,
occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have
"[s]ome impairment in reality testing or communication" or "major impairment in several areas,
such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior
"considerably influenced by delusions or hallucinations" or "serious impairment in
communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost
all areas . . . ."  (Id.)

having a "fair" ability to follow rules, relate to co-workers, use judgment, interact with

supervisor, function independently and maintain attention / concentration and a "poor / none"

ability to deal with the public and deal with work stresses. (R. at 265).  He further concluded that

plaintiff had a "fair" ability to understand, remember and carry out simple instructions, detailed

but not complex instructions, and complex job instructions. (R. at 265).  Finally, while Andrews

found plaintiff to have a "fair" ability to maintain personal appearance and demonstrate

reliability, he found plaintiff had a "poor / none" ability to behave in an emotionally stable

manner and relate predictably in social situations. (R. at 266).

In late September, early October 2002,[4] a DDS psychologist, Ray Milke ("Milke"),

completed two reports.  He did not examine plaintiff and the reports appear to be based solely

upon plaintiff's medical records through that time.  In the first report Milke noted that plaintiff

had "no medically determinable mental impairment." (R. at 267).  In the second report he noted

that plaintiff suffers from bipolar disorder and that he has difficulty concentrating or thinking. (R.

at 284).  Milke further recognized that plaintiff has "inflexible and maladaptive personality traits

which cause either significant impairment in social or occupational functioning or subjective

distress, as evidenced by ... persistent disturbances of mood or affect and intense and unstable

interpersonal relationships and impulsive and damaging behavior." (R. at 288).  Milke explained

that plaintiff has an "[e]xplosive / antisocial" personality disorder. (R. at 288).  Milke further

commented that plaintiff suffers from affective disorders and anxiety-related disorders. (R. at

290).  With respect to the ratings of functional limitations, Milke concluded that plaintiff had

---

[4] The first report is dated September 27, 2002, and the second report is dated October 1,
2002. (R. at 267, 281).

6

"marked" difficulties in maintaining social functioning, "moderate" difficulties in maintaining

concentration, persistence, or pace, and "mild" restrictions of activities of daily living. (R. at

292).  Milke also found that plaintiff was "markedly limited" with respect to his ability to interact

appropriately with the general public and with his ability to maintain socially appropriate

behavior and to adhere to basic standards of neatness and cleanliness. (R. at 296).  He concluded

that plaintiff was "moderately limited" with respect to his ability to understand and remember

detailed instructions; to carry out detailed instructions; to maintain attention and concentration

for extended periods; to perform activities within a schedule; to maintain regular attendance, and

be punctual within customary tolerances; to complete a normal workday and workweek without

interruptions from psychologically based symptoms; to perform at a consistent pace without an

unreasonable number and length of rest periods; to accept instructions and respond appropriately

to criticism from supervisors; to get along with coworkers or peers without distracting them or

exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to

set realistic goals or make plans independently of others. (R. at 295-96).  Finally, Milke found

plaintiff was "not significantly limited" with respect to the ability to remember locations and

work-like procedures; to understand and remember very short and simple instructions; to carry

out very short and simple instructions; to sustain an ordinary routine without special supervision;

to work in coordination with or proximity to others without being distracted by them; to make

simple work-related decisions; to ask simple questions or request assistance; to be aware of

normal hazards and take appropriate precautions; and to travel in unfamiliar places or use public

transportation. (R. at 295-96).  As a means of elaborating upon these conclusions, Milke noted

that plaintiff "can do low stress, routine and repetitive work that does not involve a lot of inter-personal interaction." (R. at 297).

On December 9, 2002, plaintiff apparently checked into the behavioral health unit at The Washington Hospital, complaining of homicidal thoughts. (R. at 352). He was noted to be angry, depressed and frustrated. (R. at 352). He was diagnosed as having major depression with intermittent explosive disorder and a personality disorder. (R. at 352). His GAF score was rated at 45. (R. at 352). He was discharged after five days.

On February 27, 2003, Linda Kovach, LSW, plaintiff's therapist, completed a questionnaire sent to her by plaintiff's then-attorney. In her answers, Ms. Kovach stated that plaintiff had a medical history of a bipolar disorder with intermittent explosive episodes. (R. at 385). She opined that plaintiff was not capable of being employed on a regular and continuous basis because he is easily angered, anxious, "has a tendency to become violent toward others," has poor concentration and poor social interaction. (R. at 385).

Dr. Pillai, plaintiff's treating psychiatrist and Ms. Kovach, completed a medical source statement form on May 2, 2003. (R. at 386-88). They report that plaintiff has a "poor" ability to adjust to a job, with "poor" indicating that the ability to function is "seriously limited but not precluded." (R. at 386). More specifically, they conclude that he has a "poor" ability to follow work rules; relate to co-workers; deal with the public; use judgement; interact with supervisors; deal with work stresses and maintain attention / concentration. (R. at 386). They do rate him, however, as having a "fair" (meaning that the ability to function is limited but satisfactory) ability to independently function. (R. at 386). They describe plaintiff as having a history of mood swings documented with poor impulse control, as being irritable, as having a low frustration

tolerance, and as being prone to angry outbursts and having thoughts of hurting others. (R. at 387).  The rate him as having a "poor" ability to understand, remember and carry out complex job instructions, but of having a "fair" ability to understand, remember and carry out detailed, but not complex job instructions and a "fair" ability to understand, remember and carry out simple job instructions. (R. at 387).  Dr. Pillai and Ms. Kovach added, as clarification to those assessments, that plaintiff has a history of poor judgment, poor insight and poor memory.  They explained that plaintiff has racing thoughts at times which affect his rationality and logic, especially when angered and depressed. (R. at 387).  Further, while they rated him as having a "fair" ability to maintain personal appearance, they rated him as having a "poor" ability to behave in an emotionally stable manner, to relate predictably in social situations, and to demonstrate reliability. (R. at 387).  Again, in support of these assessments Dr. Pillai and Ms. Kovach referenced plaintiff's history of mood swings, angry outbursts and vocalization of threats to others. (R. at 388).

John Carosso, who is a DDS psychologist ("Carosso"), examined plaintiff on April 25, 2003 and also reviewed records provided by the Disability Bureau. (R. at 389).  Carosso confirmed earlier diagnoses of bipolar disorder and a personality disorder (anti-social). (R. at 393).  Carosso reported that plaintiff scored within the borderline range of intellectual ability and acknowledged plaintiff's long history of legal and mental health issues. (R. at 392).  Carosso stated that plaintiff's "intellectual and mental deficits are well documented and concern about his difficulty in functioning in a work environment is likely, to some extent, well founded." (R. at 392).  Carosso concluded that plaintiff would need instructions presented to him in a simple and calm manner, but anticipated that plaintiff would have difficulty performing even simple and

repetitive tasks if pressured with time demands. (R. at 392).  Carosso noted that plaintiff's

employer would "need to be understanding and sympathetic to his propensity for problems with

reliability, honesty and angry emotional outbursts." (R. at 392).  Carosso recognized that plaintiff

has significant problems relating to others and easily becomes irritated with others. (R. at 392).

Carosso further opined that plaintiff likely would have difficulty tolerating the stress of day to

day work. (R. at 392).  Ultimately, he found that plaintiff's prognosis was "guarded, given his

criminal, intellectual functioning, and mental status." (R. at 392).

### *Discussion*

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c (a)(3)(A).

Similarly, a person is unable to engage in substantial gainful activity when "his physical or

mental impairment or impairments are of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §

1382c (a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential

evaluation must be applied.  20 C.F.R. § 416.920.  The evaluation consists of the following

stages: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not,

whether the claimant has a severe impairment; (3) if so, whether the claimant's severe

impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P,

app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity.  20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).  If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the ALJ may find that the plaintiff is not disabled.  Burns v. Burnhart, 312 F.3d at 119.  The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process.  Id.

In the instant case, the ALJ found: (1) plaintiff has not engaged in substantial gainful activity since the alleged onset of disability; (2) plaintiff suffers from bipolar disorder, mixed type, a personality disorder and a history of alcohol abuse in full remission, which are severe; (3) these impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff cannot return to any past relevant work; and (5) there were jobs in the national economy that plaintiff could perform.  (R. at 41).

Plaintiff urges that the ALJ erred at the fifth step of the analysis in that he improperly discounted the opinions of those medical professionals who actually treated and / or examined him.  The court disagrees.  Much of what plaintiff relies upon in support of his argument comes from reports submitted by Dr. Pillai, Ms. Kovach and Carosso which were submitted after the ALJ issued his decision.  The ALJ did not have the benefit of this information and could not have considered the conclusions set forth in the reports.  It would be improper for the court to consult these reports in assessing whether the ALJ's decision is supported by substantial evidence of record. See Matthews v. Apfel, 239 F.3d 589 (3d Cir. 2001) (stating that "[e]vidence that was not

11

before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence.").

Certainly, a claimant may ask for a remand based upon evidence that was not submitted to the ALJ.  Yet to secure such a remand, the claimant must demonstrate that the evidence is "new" and that it is "material." <u>Szubak v. Sec. of Health and Human Servs.</u>, 745 F.2d 831, 833 (3d Cir. 1984).  To be "material," the evidence must be relevant and probative and it must relate to the time period for which benefits were denied. <u>Szubak</u>, 745 F.2d at 833.  Finally, the claimant must prove "good cause" for not having previously introduced evidence into the administrative record. <u>Id</u>.  Here, plaintiff has not asked for a remand to the ALJ for consideration of these reports; nor has plaintiff otherwise argued that the evidence satisfies the "new," "material" or "good cause" requirements.  Accordingly, the court cannot consider these reports.

Having set these reports aside, the court must assess whether the ALJ's conclusion that plaintiff could perform certain jobs, including a truck unloader, a sanitation worker, a saw mill laborer, a stock clerk, a laundry worker and a hotel/motel cleaner, is supported by substantial evidence of record.  A review of the record and the parties' submissions, convinces me that plaintiff has two types of limitations: (1) mental /intellectual and (2) behavioral / emotional.  The court finds that the ALJ's findings regarding plaintiff's mental / intellectual and behavioral / emotional limitations are supported by substantial evidence of record and are consistent with the jobs set forth above.

As to the mental / intellectual limitations, Dr. Pillai rated plaintiff's GAF score at 55 - which denotes only moderate symptoms. (R. at 324).  John Carosso, who examined plaintiff, also rated plaintiff's GAF score at 55. (R. at 394).  Further, while plaintiff's intellectual ability is on

the borderline range, he presents as one functioning within the low average range. (R. at 37, 360).

Additionally, plaintiff graduated from high school and completed vocational technical training.

(R. at 391, 414).  Further, records from those who treated or examined plaintiff unquestionably

demonstrate that plaintiff has the intellectual ability to perform at least simple tasks.  Indeed,

Andrews determined that plaintiff had a "fair" ability to understand and carry out not only

"simple" job instructions, but "detailed but not complex" job instructions as well. (R. at 265).

Dr. Pillai and Ms. Kovach similarly found that plaintiff has a "fair" ability to understand,

remember and carry out not only simple job instructions, but detailed, though not complex, job

instructions as well. (R. at 387).[5]

   With respect to plaintiff's emotional and behavioral limitations, the ALJ's findings are

also consistent with the evidence of record.  For instance, Andrews concluded that plaintiff had a

"fair" ability to relate to coworkers, interact with a supervisor and function independently. (R. at

265).  Milke found plaintiff to only be "moderately limited" with respect to accepting

instructions and responding appropriately to criticism from supervisors and to get along with

coworkers or peers without distracting them or exhibiting behavioral extremes. (R. at 295-96).

He also concluded that plaintiff was "not significantly limited" with respect to the ability to work

in coordination or proximity to others without being distracted by them. (R. at 295)  Further, Dr.

Pillai and Ms. Kovach acknowledged that while plaintiff's ability to relate to co-workers, to

---

   [5] Milke, though he did not examine plaintiff, similarly found that plaintiff was "not
significantly limited" with respect to the ability to remember work like procedures, to understand
and carry out very short and simple instructions, to make simple work related decisions and to
sustain an ordinary routine without special supervision. (R. at 295-96).

interact with supervisor(s) and to deal with work stresses is "seriously limited," it is not precluded. (R. at 386).

As defendant observes, the medical records do not appear to preclude simple routine work which does not involve significant interaction with coworkers or the general public. The hypothetical posed to the vocational expert ("VE"), is consistent with these limitations:

> If we assume a person of the same age, education and work experience as the Claimant, assume no exertional impairment but assume there is [sic] additional limitations. The job should not involve work around the general public at all and no close interaction with supervisors or coworkers. And no work with more than two or three coworkers or supervisors who would generally remain the same. Preferably work ... by self. The job should not involve fast paced or assembly line work and no more than rare use of detailed or complex instructions. No more than rare requirement to engage in close concentration or attention to detail for extended periods. ... Would there be any jobs such a person could do at say the heavy, medium, light levels?

(R. at 449-50). The VE responded that various positions were available, including truck unloader, sanitation worker, sawmill laborer, stock clerk, laundry worker, hotel / motel cleaner and a flagger. (R. at 450). The VE further explained that these jobs did not involve interaction with customers or the general public and that, as such, a supervisor would generally tolerate approximately one brief, verbal, argumentative outburst directed either at the supervisor or a coworker, per week. (R. at 452).

Because the VE concluded that a substantial number of jobs existed which were consistent with the limitations posed by the ALJ, and because the limitations posed by the ALJ are consistent with the findings of those individuals who either treated plaintiff, examined him in a consultative capacity or reviewed his records, the ALJ's determination that plaintiff is not entitled to benefits shall be affirmed.

14

*Conclusion*

Based upon the evidence of record and the parties' submissions, this court concludes that the ALJ's decision is  supported by substantial evidence of record.

Therefore, plaintiff's motion for summary judgment (Docket No. 6) is **DENIED**, and defendant's motion for summary judgment (Docket No. 8) is **GRANTED** .

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff, David C. Dillow.

The clerk shall mark this case as closed.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge


Dated: January 30, 2006

cc: counsel of record

15